# EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
No. 2584CV01502-BLS2

MASSACHUSETTS GAMBLING RECOVERY LLC

vs.

BLAZESOFT, LTD and others[1]

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTIONS TO COMPEL ARBITRATION**

Massachusetts Gambling Recovery LLC (Plaintiff or MGR) brought this single count action against Blazesoft Ltd., Blazegames, Inc., and SCPS LLC d/b/a Zula Casino (the Zula Entities) and PTT, LLC d/b/a High 5 Games and High 5 Entertainment, LLC (the High 5 Entities) (collectively, Defendants),[2] seeking treble damages for gambling losses incurred by non-party players of Defendants' online games pursuant to the Loss Recovery Act (LRA), G. L. c. 137, § 1. Before me are Defendants' Motions to Compel Arbitration. After hearing and review, and for the reasons that follow, Defendants' Motions are **ALLOWED**.

---

[1] Blazegames, Inc.; SCPS LLC d/b/a Zula Casino; PTT, LLC d/b/a High 5 Games; and High 5 Entertainment, LLC

[2] Per Plaintiff's First Amended Complaint, Blazesoft, Ltd. is a Canadian corporation based in Ontario, Canada which owns and operates Blazegames, Inc., a Delaware corporation based in Ontario, Canada. In turn, Blazegames, Inc. operates SCPS LLC d/b/a Zula Casino, a Delaware corporation based in Delaware. PTT, LLC d/b/a High 5 Games and High 5 Entertainment, LLC are Delaware corporations, based in New York, which operate "High 5 Casino."

## BACKGROUND

### I. Legal Landscape

"Commercial gambling is illegal in Massachusetts except where expressly authorized." DeCosmo v. Blue Tarp Redevelopment, LLC, 487 Mass. 690, 692 (2021), citing G. L. c. 271, § 2; G. L. c. 23K. The Massachusetts Gaming Commission is responsible for licensing, oversight, and comprehensive investigation and regulation of gaming establishments. Gattineri v. Wynn MA, LLC, 493 Mass. 13, 21 (2023), citing G. L. c. 23K, §§ 1(1), 3(a, l), 6(b), 12(a).[3] "Only those table games and their rules authorized by the Commission . . . may be offered for play in a gaming establishment." 205 Code Mass. Regs. § 147.02 (2026). New games or game variations may only be offered by a licensed gaming establishment and only after approval by the Commission in accordance with its regulations, which require independent certified testing, field trials, public comment, and review. 205 Code Mass. Regs. §§ 147.02, 147.04; DeCosmo, 487 Mass. at 692. Entities that provide such gaming or otherwise solicit or accept gambling wagers without the requisite license and regulatory approval are subject to criminal and civil penalties. See generally G. L. c. 271, §§ 1-22B, 31, 42; G. L. c. 23K, §§ 3, 6. "Where gambling has been legalized, the Legislature has strictly regulated it, giving administrative agencies broad powers to oversee its licensing and operation to protect the public interest." Gattineri, 493 Mass. at 20. See G. L. c. 23K, § 1(1) ("[S]trict oversight of all gaming establishments through a rigorous regulatory scheme is the paramount policy objective").

Apart from and long predating the Commonwealth's modern regulatory regime, the LRA has authorized private causes of action to recover certain losses incurred through illicit gambling. G. L. c. 137, § 1. The origins of the LRA date back three

[3] In this context, the terms "gaming" and "gambling" are synonymous. Commonwealth v. Theatre Advert. Co., 286 Mass. 405, 411 (1934), citing Commonwealth v. Taylor, 14 Gray, 26, 29 (1859); G. L. c. 139, §§ 14, 15; G. L. c. 137.

centuries. "At common law, gambling losses were not recoverable," Burt v. Playtika, Ltd., 132 F.4th 398, 401 (6th Cir. 2025), citing Nichol v. Batton, 11 Tenn. 469, 474 (Tenn. Err. & App. 1832), because both parties to the transaction were considered *in pari delicto* – equally at fault. 7 Williston on Contracts § 17:23 (4th ed. 2026), citing cases. In 1710, Parliament enacted the so-called, "Statute of Queen Anne," which outlawed certain forms of gambling,[4] declared as void all contracts growing out of gambling transactions, and permitted a losing party to sue the winner for the amount lost and costs. 9 Anne ch. 19 (1710), reproduced in 9 Statutes of the Realm (George Eyre & Andrew Strahan, pubs., 1810-1822).[5] If the losing party, without just cause, failed to bring suit within three months, then any other person could sue the winner for treble the amount, with half going to the third-party and the rest going to "the poor of the parish where the offence [was] committed." DC Gambling Recovery LLC v. American Wagering, Inc., No. 25-CV-01023 (CJN), 2026 WL 850330, at *1 (D.D.C. Mar. 26, 2026), quoting 9 Anne ch. 19, § 2. After breaking from Great Britain, numerous States, including Massachusetts, passed their own versions of the Statute of Anne, containing similar language and with a similar deterrent purpose. Humphrey v. Viacom, Inc., No. 06 2768 DMC, 2007 WL 1797648, at *3 (D.N.J. June 20, 2007); 7 Williston on Contracts § 17:23 (collecting statutes including G. L. c. 137, § 1). See DC Gambling Recovery, No. 25-CV-01023 (CJN), 2026 WL 850330, at *2 (D.D.C. Mar. 26, 2026), quoting Burt, 132 F.4th at 402 (American statutes likewise "meant to 'prevent a gambler from abusing the vice and

---

[4] That is, "[c]ards, [d]ice, [t]ables or other [g]ame or [g]ames whatsoever or by betting on the [s]ides or [h]ands of such as do play at any of the [g]ames aforesaid." 9 Anne ch. 19 (1710).

[5] See DC Gambling Recovery LLC v. American. Wagering, Inc., No. 25-CV-01023 (CJN), 2026 WL 850330, at *1 (D.D.C. Mar. 26, 2026); Humphrey v. Viacom, Inc., No. 06 2768 DMC, 2007 WL 1797648, at *3 (D.N.J. June 20, 2007); Pearsall v. Alexander, 572 A.2d 113, 115 n.1 (D.C. 1990); and LaFontaine v. Wilson, 45 A.2d 729, 732 (Md. 1946) (all discussing historic provisions of Statute of Queen Anne).

exceeding limits which bring harm to the gambler and his or her family.'").[6]

The LRA, first enacted in Massachusetts in 1785, St. 1785, c. 58, "was plainly taken from the English statute of [Queen] Anne." Cole v. Applebury, 136 Mass. 525, 528, 530-531 (1884).[7] As originally enacted, it granted a losing party three months to pursue a recovery action and thereafter, permitted any "informer" to sue for treble damages, with "one half to his use, and the other half to the use of the poor of the town where the offence was committed." Cole, 136 Mass. at 529, citing St. 1785, c. 58. The statute was amended in 1860 to permit a prevailing informer to retain the whole recovery without allocating a share to public or charitable coffers. Low v. Blanchard, 116 Mass. 272, 273-274 (1874). Historically, the Commonwealth prohibited nearly all forms of gambling but has progressively loosened restrictions on certain forms of gambling in recent decades culminating, most notably, with the legalization of casino gambling in 2011 and sports betting in 2022.[8] As a consequence, the LRA was amended in 2011 and 2022 to

---

[6] Although the specific elements of these statutes vary across the States, they "share a common origin and purpose. They were intended to prevent gamblers and their families from becoming destitute due to gambling losses—and thus becoming wards of the State—by providing a method for the gambler's spouse, parent or child to recover the lost money from the winner." Humphrey, No. 06 2768 DMC, 2007 WL 1797648, at *3 (D.N.J. June 20, 2007), citing Berkebile v. Outen, 311 S.C. 30, 55 (1993) (statute's purpose is to "protect a gambler . . . from abusing the vice and exceeding limits which bring harm to the gambler and his or her family"); Salonen v. Farley, 82 F. Supp. 25, 28 (E.D. Ky. 1949) (statute was "primarily intended by the legislature . . . for the protection of the dependents of those losing in gambling"). See also Marc Edelman, *A Short Treatise on Fantasy Sports and the Law: How America Regulates Its New National Pastime*, 3 Harv. J. Sports & Ent. L. 1, 46 (2012) (explaining that the laws aimed to keep "gambling losers from becoming wards of the state due to their risky financial behavior").

[7] Colonial-era forerunners of the LRA date back to at least 1736. Cole, 136 Mass. at 528.

[8] Following a brief legalization during the Great Depression, the Legislature re-legalized "Bingo" and the Lottery in 1971, St. 1971, c. 486 & 813. It legalized casino gambling in 2011, St. 2011, c. 194, online fantasy sports betting in 2016, St. 2016, c. 219, and most other types of sports wagering in 2022, St. 2022, c. 173.

expressly exempt licensed casino gaming and sports betting from its recovery provisions but has otherwise remained essentially unchanged for more than 150 years. In its present form, G. L. c. 137, § 1 provides an individual who has lost money or goods through unlicensed gambling the right to recover; but "if he does not within three months after such loss . . . without covin or collusion, prosecute such action with effect, any other person may sue for and recover in tort treble the value thereof." Curran v. Sideprize LLC, No. 2477CV01075, 2025 WL 1927786, at *1 (Mass. Super. Apr. 30, 2025) (Dreschler, J.), quoting G. L. c. 137, § 1.

## II. Factual Background

MGR is a Delaware corporation with a business address in Tampa, Florida. Its stated purpose is to enforce Massachusetts gambling laws. MGR alleges that Defendants operate unlicensed and unregulated online "sweepstakes casinos" that permit users to purchase virtual coins to play traditional casino games – slots, blackjack, craps, etc. – with the prospect of winning additional coins that can be exchanged out for United States dollars.[9] Defendants' platforms are accessible to users in Massachusetts and elsewhere. MGR acknowledges that it "has no relationship to any gambler who has suffered gambling losses" using Defendants' online platforms and has not identified any specific user who losses underly its claims. Amend. Compl. ¶ 6. Nonetheless, MGR seeks to recover three times the losses incurred by Massachusetts users of Defendants' online casino platforms, pursuant to the LRA.

At all times relevant hereto, users of Defendants' platforms were required to create an account and accept Defendants' terms and conditions, presented via clickwrap agreement, to access Defendants' platforms and games. These agreements included binding arbitration clauses applicable to any dispute arising out of or relating to the use

[9] Defendants generally dispute these allegations.

of the platforms.[10] Defendants seek to compel MGR to arbitrate its claim despite the fact that MGR is not a party to any agreement containing the arbitration clauses. MGR does not dispute, at least for the purposes of the present motions, that the clauses would be enforceable against users of Defendants' platforms or, specifically, that an individual user who sought to recover losses from Defendants on his own behalf pursuant to G. L. c. 137, § 1, would be required to arbitrate such a claim. MGR contends, however, that it cannot be compelled to arbitrate because the present matter does not fall within the limited circumstances in which an arbitration clause may be enforced against a non-signatory to the contract.

## DISCUSSION

"An arbitration agreement is a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute" (internal quotations omitted). Viking River Cruises, Inc. v. Moriana, 596 U.S. 639, 653 (2022). Such an agreement "does not alter or abridge substantive rights; it merely changes how those rights will be processed." Id. "[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral . . . forum" (quotations omitted). Id.

Whether a party is bound by an arbitration clause "is a 'gateway dispute' . . . for the court, and not the arbitrator, to decide in the first instance." Walker v. Collyer, 85 Mass. App. Ct. 311, 317 (2014), quoting Massachusetts Highway Dep't v. Perini Corp., 444 Mass. 366, 375 (2005). Where, as here, there is no dispute of material fact as to content of the clauses or the status of the parties in relation thereto, I may decide the issue as a matter of law. McInnes v. LPL Fin., LLC, 466 Mass. 256, 261 (2013).

[10] The presentation and specific terms of the arbitration provisions are not at issue in the present Motions. As discussed *infra*, the only present dispute is whether the provisions are binding upon MGR as a nonsignatory.

"Arbitration agreements in Massachusetts are governed by the MAA [Massachusetts Arbitration Act], G. L. c. 251, §§ 1 et seq., and where the contract involves a transaction affecting interstate commerce, by the FAA [Federal Arbitration Act], 9 U.S.C. §§ 1 et seq." Id. at 260.[11] The MAA, FAA, and relevant case law "all demonstrate the strong public policy in favor of arbitration in commercial disputes." GGNSC Admin. Servs., LLC v. Schrader, 484 Mass. 181, 191 (2020). "Under both acts, arbitration agreements are enforceable 'save upon such grounds as exist at law or in equity for the revocation of any contract.'" Id., quoting St. Fleur v. WPI Cable Sys./Mutron, 450 Mass. 345, 350 (2008) and 9 U.S.C. § 2. "[A]ny doubts concerning the scope of arbitrable issues [must] be resolved in favor of arbitration." McInnes, 466 Mass. at 260, quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983) (additional quotations omitted). Here, there is no dispute that Massachusetts users, who agreed to Defendants' terms and conditions, and subsequently lost money playing online games, would be required to arbitrate their

[11] MGR's claim of recovery is based upon transactions between Massachusetts users and the online platforms of Defendants, who are based and incorporated elsewhere, specifically Canada, New York, and Delaware. Thus, the parties concede that the FAA governs. MGR's claims against the Canada-based Zula Entities are additionally subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the Convention), a multilateral treaty that addresses international arbitration. See Boatner v. SSPS LLC, No. 25 CIV. 3251 (DEH), 2025 WL 3281509, at *2 (S.D.N.Y. Nov. 25, 2025) (FAA and Convention governed claims against Zula Entities); Ambrosia v. Blazesoft Ltd., No. 25 C 1723, 2025 WL 2976477, at *3 (N.D. Ill. Oct. 21, 2025) (same). The Convention narrows defenses against arbitration between signatories to those "that can be applied neutrally on an international scale[,] . . . such as fraud, mistake, duress and waiver," DiMercurio v. Sphere Drake Ins., PLC, 202 F.3d 71, 79 (1st Cir. 2000), but it is silent as to nonsignatories. In such circumstances, "domestic doctrines [ ] fill [the] gaps" and the Convention principles of equitable estoppel apply to the same extent as under the FAA. GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC, 590 U.S. 432, 438-440 (2020). Thus, the applicability of the Convention to a subset of the Defendants does not alter my present inquiry or conclusions.

LRA claims to recover such losses. Fair Gaming Advocates MA LLC v. VGW Holdings Ltd., No. 2384-CV-02451, 2024 WL 5279408, at *1 (Mass. Super. Dec. 12, 2024) (Fair Gaming MA). The question here, however, is whether MGR may also be compelled to arbitrate.

"Regardless whether the [MAA] or the [FAA] governs the underlying dispute, . . . traditional principles of Massachusetts contract law determine whether nonsignatories can be compelled to arbitrate." Walker, 85 Mass. App. Ct. at 315, citing Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 12 & n.26 (1st Cir. 2014). It is an "abecedarian tenet that a party cannot be forced to arbitrate if it has not agreed to do so." Walker, 85 Mass. App. Ct. at 319, quoting InterGen N.V. v. Grina, 344 F.3d 134, 137 (1st Cir. 2003). However, "the obligation to arbitrate is not limited to those who have signed an arbitration agreement." Walker, 85 Mass. App. Ct. at 319. Courts have compelled nonsignatories to arbitrate claims under several theories grounded in common-law principles of agency and contract law: "(1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, (5) estoppel, and (6) third-party beneficiary." Id. While these principles are more circumscribed where a signatory seeks to compel a nonsignatory to arbitrate than where their positions are reversed, id., a nonsignatory may be compelled to arbitrate claims derived from a signatory's rights or where the nonsignatory effectively stands in the shoes of a signatory. See, e.g., GGNSC Admin. Servs., 484 Mass. at 192; Zynga, Inc. v. Mills, 431 So.3d 935, 942 (Ala. 2025), discussed infra. See also United States v. Bankers Ins. Co., 245 F.3d 315, 323 (4th Cir. 2001) (False Claims Act suit was derivative of agencies' rights and thus, Attorney General was bound by arbitration agreement agencies signed).

Defendants contend that MGR should be compelled to arbitrate because its claim is based upon, and derivative of, the rights of Massachusetts users or, alternatively, equitable principles estop MGR from avoiding arbitration. MGR responds that it was not a signatory to Defendants' terms and conditions, bears no relationship to the users

or the transactions underlying the claims, and incurred no benefits therefrom. Defendants present the better of the arguments.

To be sure, the present circumstances do not fit neatly into our appellate precedent enforcing arbitration clauses against nonsignatories, but that is largely a product of the peculiar structure of the LRA – specifically, its transfer of the losing gambler's right to recover to "any other person." G. L. c. 137, § 1. But I do not read the LRA as creating a means for "any other person," such as MGR, to avoid an arbitration clause that would bind the gambler himself. Rather, I conclude that because MGR's LRA claim assumes the rights of the losing gamblers and allows MGR to step into their shoes, MGR's claim is effectively derivative of the gamblers' rights as relate to the enforceability of the arbitration clause. Therefore, MGR is required to arbitrate to the same extent as the signatories. Even if MGR's claim is not derivative, the FAA would preempt any reading of the LRA that permits MGR to avoid arbitration. Finally, in accordance with two prior decisions of this Court in substantively identical cases, the principles of equitable estoppel provide an additional, independent basis to order MGR to arbitrate its claim.

## I. <u>MGR Stands In the Shoes of the Losing Gamblers</u>

MGR asserts that the SJC's 142-year-old decision in <u>Cole</u>, supra, forecloses any argument that the present claim is derivative of the losing gamblers' rights. There, the SJC stated that the plaintiff-third-party did "not derive his right to sue for the penalty from the loser, and the right to recover it d[id] not arise from a contract in which both are jointly interested." 136 Mass. at 531. The facial relevance of this statement collapses upon further examination.

The issue in <u>Cole</u> was not, as here, the impact of an agreement between the defendant and the losing gambler on a third-party's claim but whether apparent collusion between the losing gambler *and the third-party plaintiff* barred such a third-party action. <u>Id.</u> at 527. There, the third-party brought suit to recover treble damages

based on his brother's gambling losses. Id. at 525. The SJC addressed two issues. First, whether the statute's requirement that the plaintiff bring the action "without covin or collusion" referred to the losing gambler's "covin or collusion" with the defendants (the winning bookmakers) or the plaintiff – the SJC held it was the former. Second, having so answered the first question, the SJC was forced to address the seemingly inherent flaw in the statute which incentivizes a losing gambler and third-party to agree for the losing gambler to forego his suit in favor of the third-party so that the two may share in treble recovery. Id. at 530-531. The Cole defendants alleged that the plaintiff and his brother had orchestrated such a scheme. Id. The SJC concluded that, per the statutory terms, a successful third-party could dispose of any recovery as he saw fit and he was not barred by equitable principles from recovering based on his brother's losses absent evidence of an agreement "to the extent of making it [his brother's] suit," which the jury did not find. Id. at 531. Thus, fairly read in this context, the statement in Cole that a third-party's claim does not "derive" from the losing gambler's right or "arise from a contract in which both are jointly interested" merely stands for the unremarkable proposition that a third-party claim does not require or preclude an agreement "*between the plaintiff and the loser*" to share in the recovery as long as the third-party action does not amount to a strawman for the loser's suit (emphasis added). See id.

Cole did not – and had no reason to – address the extent to which terms of an agreement between the loser and winner – that is, terms of the gambling transaction itself – are binding upon subsequent third-party litigants. Indeed, there is no suggestion that the Legislature or any court, until very recently,[12] had any reason to contemplate the effect of such terms, including arbitration provisions, on nonsignatory,

[12] See Curran, 2025 WL 1927786, at *2-3 (ordering plaintiff-nonsignatory to arbitrate his third-party LRA claims based on equitable estoppel principles), citing Fair Gaming Advocates MA, 2024 WL 5279408, at *1 (same).

third-party claimants. As this Court has noted, the dearth of caselaw and historical evidence is unsurprising. Curran, 2025 WL 1927786, at *2. For nearly all its history, the LRA existed in a world where illegal gambling was conducted in the shadows – in backroom card games, back-alley bookmaking, underground "cock[ ]-fightings, horse-races, dog-matches[, ] foot-races" and the like. Grace v. McElroy, 83 Mass. 563, 565 (1861). The statute was spawned from the limited ability of then-existing authorities to detect and police such covert activities. Cole, 136 Mass. 528-531. See Salamon v. Taft Broad. Co., 475 N.E.2d 1292, 1298 (Ohio Ct. App. 1984) ("[I]t is not possible to ignore the ancient and arguably anachronistic nature" of such recovery actions "born in a vanished era where the absence of an organized police authority to enforce criminal statutes made necessary the use of such rewards for informers"). To the extent the gambling activities were subject to any "terms and conditions," they were almost assuredly unwritten and enforced extrajudicially rather than through arbitration. To be sure, the Legislature amended G. L. c. 137, § 1 in 2011 and 2022, to provide for legalized casino gambling and sports betting and free the industries from the threat of burdensome litigation. But to the extent the Legislature could have foreseen the subsequent proliferation of online gaming and associated clickwrap agreements, there is no indication it considered such matters in perpetuating the LRA.

MGR argues that, regardless, the SJC has labeled third-party LRA claims as "*qui tam*" actions. Plummer v. Gray, 74 Mass. 243, 243 (1857).[13] Thus, MGR contends, its claim is on behalf of the Commonwealth not the losing gambler. I am not persuaded

[13] *Qui tam* "is a Latin expression which translates in full into 'who sues on behalf of the king as well as for himself.'" Scannell v. Attorney Gen., 70 Mass. App. Ct. 46, 49 (2007). Accord Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 769 n.1 (2000). A *qui tam* action is as "[a]n action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive." *Qui Tam Action*, Black's Law Dictionary (12th ed. 2024).

that a shorthand reference to an LRA claim as a *qui tam* action in a two-paragraph decision issued nearly 170 years ago is determinative of the present motions.[14] More relevant is the manner in which the LRA operates, which the SJC also long ago labeled "anomalous." Cole, 136 Mass. at 532.

Third-party LRA claims are punitive and intended to further to the public purpose of deterring illicit gambling. See G. L. c. 137, § 1; Donovan v. Eastern Racing Ass'n, 324 Mass. 393, 394 (1949). But aside from a right to treble damages, MGR stands in the shoes of the losing gamblers, not the government, in all respects. The LRA does not require a third-party to sue in the Commonwealth's name or on the government's behalf. Cf., e.g., Cole v. Figliola & Romano, LLC, 106 Mass. App. Ct. 1129, 2026 WL 935068, *1 (Apr. 7, 2026), quoting Mass. False Claims Act, G. L. c. 12, § 5C(2) ("*qui tam* action[ ] must 'be brought in the name of the commonwealth or the political subdivision thereof'"). Accord Scannell v. Attorney General, 70 Mass. App. Ct. 46, 49 (2007). See also United States ex rel. Polansky v. Executive Health Res., Inc., 599 U.S. 419, 425 n.1 (2023) ("*qui tam* suits designate[ ] the plaintiff as 'United States ex rel. [the private party's name]'"); Burt, 132 F.4th at 404 ("Because [Tennessee Statute of Anne] contains no language requiring that the private plaintiff bring the action on behalf of the state, it is likely not a *qui tam* statute" [internal quotation omitted].).

---

[14] Plaintiff cites additional century-old decisions from other jurisdictions referring to other States' Statutes of Anne as *qui tam* laws. (See Pl.'s Supplemental Response at 1-2), citing Marvin v. Trout, 199 U.S. 212, 226 (1905) (discussing Ohio's Statute of Anne); Kuder v. Cronice, 7 Ohio 249, 249-50 (1836) (same); Trumbo v. Finley, 18 S.C. 305, 307 (1882) (South Carolina statute). Defendants rely on recent federal court decisions holding, after thorough analysis, that third-party claims under Tennessee's and Kentucky's recovery statutes are not *qui tam* actions. See Burt, 132 F.4th at 404; Kentucky Gambling Recovery LLC v. Underdog Sports Holdings, Inc., 3:25-cv-00066-CHB-EBA, 2026 WL 2406103, at *4 (E.D. Ky. 2026). Plaintiff's older cases use the term merely in passing, by analogy, or *sensu lato*, whereas Defendants' cases apply the term more strictly and analyze the specific issue at hand.

Next, MGR's claim does not seek to redress an injury specific to the government – e.g., "a fraud or false claim against the government," Scannell, 70 Mass. App. Ct. at 49, and "[u]nlike a typical *qui tam* statute, the government receives no share of the recovery." Burt, 132 F.4th at 404. See Cayce v. VGW, Ltd., 832 F. Supp. 3d 744, 750-751 (W.D. Ky. 2026) ("Kentucky's [S]tatute [of Anne] . . . identifies injuries suffered by private parties . . . and nowhere suggests that plaintiffs suing under the statute do so on the Commonwealth [of Kentucky]'s behalf"; "[v]ictorious [ ] plaintiffs . . . bypass not only the Commonwealth's fisc but also the parties to the transaction purportedly at issue"). Third, the LRA does not include any procedural measures or safeguards to ensure the government retains control of the suit, nor otherwise indicate that the Commonwealth is the real party in interest.[15] Finally, and relatedly, MGR does not stand in the shoes of the Commonwealth because there is no indication that the LRA authorizes the Commonwealth to bring such an action itself. See G. L. c. 137, § 1 (providing that "any other person may sue"); Kilbane v. Secretary of Hum. Servs., 14 Mass. App. Ct. 286, 287 (1982) ("By definition in G.L. c. 4, § 7, twenty-third, the word 'person' . . . does not describe the Commonwealth or its subdivisions.").

Third-party actions under the LRA are more analogous to wrongful death claims, see G. L. c. 229, which the SJC has previously held are subject to arbitration to the same extent the decedent was bound. See GGNSC Admin. Servs., 484 Mass. at 192. There, the SJC reasoned that "where no cause of action for wrongful death exists unless the decedent could have sued for personal injury, then the wrongful death claim necessarily derives from the underlying tort." Id. at 188. The SJC thus followed the

---

[15] Cf. G. L. c. 12, § 5C(2)-(4),(6) (providing that "action may be dismissed only if the [A]ttorney [G]eneral gives written reasons for consenting to the dismissal and the court approves"; "copy of complaint . . . shall served on [A]ttorney [G]eneral"; " [A]ttorney general shall [ ] assume control of the action . . . or (ii) notify the court that he declines to take over the action"; "no person other than [A]ttorney [G]eneral may intervene"). Accord Fed. False Claims Act, 31 U.S.C. § 3730(b)-(f).

"majority rule" and held that because "the same tortious conduct which caused the decedent's personal injury also undergirds the wrongful death action[,] . . . the decedent enjoys [exclusive] rights over the wrongful death action such that he or she can agree to arbitrate that claim entirely" (internal quotations and citations omitted). Id. at 185, 190.

Likewise, MGR's claim under the LRA exists only to the extent it can establish that an individual gambler suffered losses and could have sued for the same. See G. L. c. 137, § 1. Admittedly, the wrongful death statute does provide that only the "executor or administrator of the deceased" can initiate the wrongful death action, G. L. c. 229, § 2, whereas the LRA vests a right to sue in "any other person" with no obligation to share any portion of the recovery with the losing gamblers or their kin. See Cole, supra. But I do not read this facet of the LRA as creating a truly independent cause of action in a third party.[16] Just as rights under the wrongful death statute vest upon the decedent's death and only to the extent the decedent could have brought suit, GGNSC Admin. Servs., 484 Mass. at 190, MGR's LRA rights vest only upon the expiration of the gambler's rights, after three months, and only to the extent the gambler possessed an LRA claim and failed to bring suit. The same conduct which caused the gamblers' losses "undergirds" MGR's suit. Id. at 192. See Lubin v. Starbucks Corp., 122 F.4th 1314, 1323 (11th Cir. 2024) (holding plaintiff required to arbitrate where "right to recover is predicated on [signatory's] right to recover").

In a decision last year, the Alabama Supreme Court reached the same conclusion, holding that the "logic" applicable to wrongful death claims applies "just as forcefully" to third-party actions under gambling recovery statute:

---

[16] The punitive nature of a third-party LRA claim does not persuade me otherwise. Punitive damages are available under the wrongful death statute, G. L. c. 229, § 2, and claimants are nonetheless bound by a decedent's agreement to arbitrate. McInnes, supra.

> "[Third-party] [c]laims under [Alabama's recovery statute] are necessarily derivative because a plaintiff cannot prevail on such a claim without showing that the alleged gambler could also have recovered .... Thus, the right created [in third parties] depends on the wrong that was directly committed against the alleged gambler. In short, a plaintiff can prevail ... only if the alleged gambler could have prevailed ....
>
> ... [I]n bringing their claims ... the [third-party] plaintiffs are standing in the legal shoes of the players and are bound by the arbitration provisions to the same extent as the players."

Zynga, 431 So.3d at 942.

As noted, I do not read the SJC's dicta in Cole as governing the question before me – one that court did not face and could not have reasonably envisaged more than 140 years ago. To the extent Cole characterized third-party LRA claims as not derivative, it merely did so with reference to agreements between losing gamblers and third-party litigants and to ensure the latter's claims were not a Trojan Horse for the former's. 136 Mass. at 531. That does not mean that the LRA's "anomalous" provisions create an action, either on behalf of the Commonwealth or the third-party itself, wholly independent from the gambler's rights, to allow MGR to sidestep the gambler's contractual promises to arbitrate. To the contrary, The LRA, by operation of law, extinguishes the rights of the losing gambler and vests them in a willing litigant. Plummer, 8 Gray at 243-244. Such a third-party litigant assumes *all* the gambler's rights of recovery under the LRA (and more with regard to multiple damages). A third party cannot join in a losing gambler's claim, nor pursue a concurrent parallel action. Id. at 244. A third party can only assert a claim to the extent the gambler could have and failed to do so. Because MGR stands in the shoes of the users, whose alleged losses undergird MGR's claim, MGR must be bound to the arbitration provisions the users executed.[17]

---

[17] My conclusion that MGR is so bound does not undermine the purposes of the LRA as it "does not alter or abridge" any substantive rights thereunder but merely addresses

## II. Federal Preemption

Even if Massachusetts law could be read to the contrary – i.e., that because a nonsignatory may pursue an LRA claim it can avoid the gambler's binding arbitration clause – it would be preempted by the FAA.

Under the FAA, arbitration agreements may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." McInnes, 466 Mass. at 260, quoting AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011). Thus, where the FAA governs, the Legislature cannot prohibit the Court from enforcing a valid arbitration agreement even if the plaintiff asserts a state statutory cause of action. McInnes, 466 Mass. at 262-263.[18] Such laws are preempted by the FAA. See id., quoting AT&T Mobility, 563 U.S. at 341 ("When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA."). In McInnes, the trial court, relying on Hannon v. Original Gunite Aquatech Pools, Inc., 385 Mass. 813 (1982), held that it could not compel a plaintiff to arbitrate a claim of unfair or

---

the forum where MGR's claim will be adjudicated. See Viking River Cruises, 596 U.S. at 653. Moreover, the arbitration provisions have no bearing on the Commonwealth's authority to enforce its gambling laws and regulations, which are wholly separate from the LRA.

[18] See Marmet Health Care Ctr., Inc. v. Brown, 565 U.S. 530, 533 (2012) (FAA preempted state's prohibition against predispute agreements to arbitrate personal injury or wrongful death claims against nursing homes), citing Preston v. Ferrer, 552 U.S. 346, 356 (2008) (FAA preempted state law granting state commissioner exclusive jurisdiction to decide issue the parties agreed to arbitrate); Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 56 (1995) (FAA preempted state law requiring judicial resolution of claims involving punitive damages); Perry v. Thomas, 482 U.S. 483, 491 (1987) (FAA preempted state law prohibiting arbitration of wage disputes); Southland Corp. v. Keating, 465 U.S. 1, 10 (1984) (FAA preempted state financial investment statute's prohibition of arbitration).

deceptive practices under G. L. c. 93A, § 9. 466 Mass. at 263. The SJC vacated the decision and remanded the case with directions to order arbitration. Id. at 267. The SJC declined to revisit the issue in Hannon – *viz.*, whether the Legislature intended to preclude a court from compelling arbitration of a c. 93A, § 9 claim – concluding that even if the Legislature so intended, "the State law would be in conflict with and displaced by the FAA[.]" Id. at 264.

In accordance with McInnes and cases cited therein, the Legislature could not flatly prohibit the courts from enforcing clauses, governed by the FAA, that required parties to arbitrate LRA claims. The FAA would preempt any such law. See id. I conclude that Massachusetts law cannot do indirectly what it could not do directly. That is, the Legislature may not (intentionally or unintentionally) remove LRA claims from the scope of an FAA-governed arbitration clause merely by substituting a nonsignatory party for the losing gambler. Thus, even if I accepted MGR's argument that it cannot be compelled to arbitrate a third-party LRA claim – which I do not – any such reading of Massachusetts law would be preempted by the FAA.

## III. Equitable Estoppel

Finally, this Court has held twice previously that third-party LRA claims were bound by arbitration agreements executed by losing gamblers, although those decisions were grounded in the principles of equitable estoppel. Curran, 2025 WL 1927786, at *2; Fair Gaming MA, 2024 WL 5279408, at *2.

Equity provides that "an entity knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement" (internal quotation omitted). Walker, 85 Mass. App. Ct. at 320. Thus, a party "who knowingly accepted the benefits . . . flowing directly from the agreement," may be bound by the arbitration clause (quotations omitted). Id. at 319, 320. Accord Washington Mut. Fin. Grp., LLC v. Bailey, 364 F.3d 260, 268 (5th Cir. 2004), quoting International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206

F.3d 411, 418 (4th Cir. 2000) ("To allow a plaintiff to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the [FAA]."); E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S., 269 F.3d 187, 200 (3d. Cir. 2001) (same). A nonsignatory may also be compelled to arbitrate where it seeks to enforce, or asserts claims under, the contract containing the arbitration clause. Cavallaro v. Wilmer Cutler Pickering Hale & Dorr, LLP, No. 1484CV03598BLS1, 2020 WL 2193633, at *4 (Mass. Super. Feb. 3, 2020) (Salinger, J.), citing Licata v. GGNSC Malden Dexter, LLC, 466 Mass. 793, 804 (2014). Accord Ribadeneira v. New Balance Athletics, Inc., 65 F.4th 1, 22 (1st Cir. 2023), quoting Noble Drilling Servs., Inc. v. Certex USA, Inc., 620 F.3d 469, 473 (5th Cir. 2010) ("estoppel applies when a nonsignatory to a contract with an arbitration clause 'seek[s] to enforce the terms of that contract or assert[s] claims that must be determined by reference to that contract'").

Fair Gaming MA presented a virtually identical posture to the case at bar – a plaintiff-LLC, "incorporated for the purpose of attempting to collect treble damages under G.L. c. 137, § 1," brought a third-party claim based on losses incurred by Massachusetts residents who played Defendants' online, casino-themed games. 2024 WL 5279408, at *1-2. The Court (Ullman, J.) acknowledged that "Fair Gaming did not derive contemporaneous benefits from the terms of service while Massachusetts residents were playing the games." Id. at *2. "Nonetheless . . . [its] treble damages claim flow[ed] directly from Massachusetts residents' [ ] agreements with [the defendants]," where (1) Massachusetts residents were required to execute agreements to play the defendants' games; and (2) the losses that provided the basis for Fair Gaming's claim were all incurred pursuant to those terms. Id. Equity thus required Fair Gaming to be bound to the arbitration clause contained in those terms where, by its claim, Fair Gaming sought "to stand in the shoes of those residents and collect the amounts they lost (with treble damages) . . . playing [ ] games pursuant to the terms of

service." Id.

In Curran, the plaintiff brought a third-party action alleging that Defendants offered sports betting through their websites without the requisite license pursuant to G. L. c. 23N. 2025 WL 1927786, at *1. Echoing the analysis in Fair Gaming MA, the Court (Dreschler, J.) concluded that "equitable estoppel barred Curran from suing to recover amounts lost by the [d]efendants' customers playing pursuant to the terms of use, while also avoiding the arbitration provisions to which those customers agreed." Id.

MGR does not attempt to distinguish the aforementioned cases. It argues they were wrongly decided. MGR asserts that it cannot be compelled to arbitrate because it did not receive contemporaneous direct benefits from Defendants' agreements with its users, and MGR does not assert a claim under those contracts. The cases on which MGR relies do not persuade. First, MGR cites InterGen, supra, for the proposition that direct benefits estoppel "has been limited to 'cases [that] involve non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause" (alteration in original). 344 F.3d at 146, quoting E.I. DuPont de Nemours, 269 F.3d at 200. But neither InterGen nor the cases cited therein concerned statutes with similar enforcement mechanisms as the LRA or analogous claims where, by operation of law, a third party stepped into the shoes on the injured party. Further, I am not so quick to conclude that MGR did not embrace the relevant agreements during the "life of the contract" simply because its LRA rights did not arise contemporaneous with each user's deposit, wager, or loss of money. Users executed the relevant agreements to create an account to access Defendants' platforms. Massachusetts users have only three months from each loss before MGR, or another willing litigant, assumes their rights; thereafter, MGR has one year to assert an LRA claim. It is reasonable to infer, particularly given the nature of online gaming and gambling, that MGR seeks to recover losses incurred by users who

still hold active accounts with Defendants' platforms subject to the same terms of service or revised iterations thereof. Indeed, where Plaintiff's Complaint does not identify any specific Massachusetts user or any specific loss incurred, I cannot conclude that MGR is *not* claiming a benefit during the lifetime of the relevant agreements.

MGR also relies upon G.G. v. Valve Corp., a case in which parents and their teenage children asserted, *inter alia,* claims under Washington State's loss recovery statute against a video game company that allegedly "allow[ed] third-party sites to operate their gambling transactions within [the defendant's] marketplace." No. C16-1941-JCC, 2017 WL 1210220, at *1 (W.D. Wash. Apr. 3, 2017), vacated, 799 F. App'x 557 (9th Cir. 2020). The defendants moved to compel arbitration based on the agreements executed by the minor children. Id. The Ninth Circuit held that the parent-plaintiffs were required to arbitrate claims on behalf of their children but not those brought on their own behalf. G.G., 799 App'x at 558-559. However, the relevant statute, Wash. Rev. Code § 4.24.070, is materially distinguishable from the LRA in that it does not provide for the transfer of rights from the losing gambler to a third party. See id. (providing a cause of action only to "persons losing money or [a ]thing of value at or on any illegal gambling games"). By definition, the parents' claims on their own behalf sought to recover their own monetary losses.

Similarly, in In re Daily Fantasy Sports Litig., No. MDL 16-02677-GAO, 2019 WL 6337762 (D. Mass. Nov. 27, 2019), the court held that family members of losing gamblers who "assert[ed] claims under various state laws regarding gambling" were not required to arbitrate their claims. Id. at *1, *13. However, the only "direct benefit" the defendants raised there was the speculative assertion that family members would have shared in any winnings of the player-plaintiffs. Id. at *13. Further, there is no indication that that case involved claims under the LRA – the matter was litigated in Massachusetts pursuant to a forum-selection clause – and the court did not address the substance of the "various state laws regarding gambling" under which the family

members asserted their claims. See id. The fact that the player-plaintiffs (losing gamblers) and family member-plaintiffs pursued their claims jointly in a single action implies that at least some of the statutory causes of action did not include the same transfer of rights as the LRA.

Last, MGR cites Fair Gaming Advocates KY LLC v. VGW Holdings Ltd., No. 25-CI-00167 (Ky. Cir. Ct. May 12, 2026), in which a state trial court denied the defendants' motion to compel the plaintiff to arbitrate third-party claims under Kentucky's recovery statute, an act substantively similar to the LRA. That decision merely stated in conclusory fashion that the plaintiff did not "step into the shoes" of the losing gamblers. Id. For the reasons discussed supra, and set forth in Curran and Fair Gaming MA, I do not agree. The Kentucky court offered little more than *ipse dixit* for its conclusion. Such a rigid and cursory application of equitable principles is incompatible with our precedent. "Equitable remedies are flexible tools to be applied with the focus on fairness and justice." Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 560 (2008), quoting Demoulas v. Demoulas, 428 Mass. 555, 580 (1998). It would substantially undermine our Commonwealth's and Federal policy favoring arbitration – e.g., that parties may rest assured that claims subject to arbitration will be arbitrated, see Good v. Uber Techs., Inc., 494 Mass. 116, 126 (2024) – if binding agreements could be circumvented by dusting of "ancient," and "arguably anachronistic" statutes rarely invoked until recent years. In sum, the cases MGR relies upon are unavailing because they do not concern or simply do not grapple with the peculiar enforcement mechanism at issue – i.e., the complete transfer of rights from signatory to nonsignatory by operation of law.

Nor do I conclude, as MGR contends, that Curran and Fair Gaming MA impermissibly applied a but-for test of direct benefits estoppel or that MGR's claim can be meaningfully adjudicated without reference to Defendants' terms and conditions. The gravamen of MGR's claim is that the casino-style games offered on Defendants'

platforms constituted gambling and that Defendants lacked the requisite licensure under G. L. c. 23K. Whether Defendants' games constituted gambling inherently "must be determined by reference to" the terms and conditions which established rules for Defendants' games and governed the users' participation, payment and interactions with the platforms. See Ribadeneira v. New Balance Athletics, Inc., 65 F.4th 1, 22 (1st Cir. 2023). The fact of the transactions between Defendants and Massachusetts users, and the nature and terms thereof, is the essence of Plaintiff's claims. Contrary to MGR's assertions, its claim cannot be meaningfully adjudicated without reference to the terms and conditions any more than an individual could meaningfully recount a game of baseball without reference to the rules. To invoke Judge Dreschler, this case "is factually on all fours" with this Court's prior precedent. See Curran 2025 WL 1927786, at *2. I am persuaded that Curran and Fair Gaming MA were rightly decided. Admittedly, certain factors overlap the derivative claim and equitable analyses. Nonetheless, principles of equity provide an independent basis to order MGR to arbitrate its claim.[19]

---

[19] I am not persuaded that the "unclean hands" doctrine precludes this result. MGR argues that it should not be equitably estopped from avoiding arbitration because Defendants "run[ ] illegal gambling operations." Pl.'s Opp. at 27. But this assumes what MGR sets out to prove. Further, arbitration agreements are enforceable even if contained in an illegal contract. See Preston v. Ferrer, 552 U.S. 346, 349 (2008) ("[Q]uestions concerning the validity of the entire contract are to be resolved by the arbitrator in the first instance, not by a federal or state court."); Sleeper Farms v. Agway, Inc., 506 F.3d 98, 103 (1st Cir. 2007) ("[T]he arbitration clause is unaffected even if the substance of the contract is otherwise void or voidable").

For its part, MGR, a Delaware corporation with a Florida address, denies any connection to the gamblers whose losses underly its claim, and, to date, has not identified any individual who incurred losses using Defendants' platform. Entities with strikingly similar names and operandi have filed similar claims in several other jurisdictions. See, e.g., Kentucky Gambling Recovery, 2026 WL 2406103, at *1. See also Ohio Gambling Recovery, LLC v. Kalshi Inc., No. 4:25-CV-1573, 2026 WL 865788 (N.D. Ohio Mar. 30, 2026); Georgia Gambling Recovery LLC v. Kalshi Inc., No.

**ORDER**

For the foregoing reasons, Defendant's Motions to Compel Arbitration are **ALLOWED** and this case is **STAYED** pending arbitration.[20]

Debra A. Squires-Lee
Justice of the Superior Court

October 8, 2026

SC2025CV001749 (Ga. St. Ct.); Illinois Gambling Recovery LLC v. Kalshi Inc., No. 2025L007524 (Ill. Cir. Ct.); Kentucky Gambling Recovery LLC v. Kalshi Inc., No. 25-CI-00512 (Ky. Cir. Ct.); Massachusetts Gambling Recovery LLC v. Kalshi Inc., No. 2584CV01630 (Mass. Super.); South Carolina Gambling Recovery LLC v. Kalshi Inc., No. 2025CP3700563 (S.C. Cir. Ct.). "Nothing in the case law or legislative history suggests that the 18th century Legislature wanted to create separate new entities who would profit by collecting treble damages, in lieu of money being returned to the gamblers who lost it." Fair Gaming MA, 2024 WL 5279408, at *2. While the identity of the plaintiff appears to be irrelevant under the LRA, with regard to equitable considerations, I do not find any party's hands appreciably cleaner than the other.

[20] G. L. c. 251, § 2(d)